# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KATINA THOMAS, G/A/L K.T. (A MINOR)**<br><br>Plaintiff,<br><br>v.<br><br>**EAST ORANGE BOARD OF EDUCATION,** *et al.*,<br><br>Defendants. | Civ. No. 2:12-01446 (WJM)<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiff Katina Thomas, guardian ad litem for K.T. (a minor), brings this action against East Orange Board of Education ("EOBE"), Superintendent Dr. Gloria Scott, John Does (1-10), Jane Does (1-10), and ABC Corp. (1-10) (collectively "Defendants"), alleging various state and federal statutory, constitutional and common law claims. Plaintiff's claims arise from Defendants' alleged failure failed to prevent students at Langston Hughes Elementary School ("LHES") from bullying K.T. This matter comes before the Court on Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED**.

## I.    BACKGROUND

The following facts are undisputed. Plaintiff K.T. is a minor student in the East Orange school district. Certification of Eric L. Harrison, Esq. ("Harrison Cert.") Ex. A at ¶ 1, ECF No. 21. K.T. transferred into the East Orange school district when she moved to New Jersey from Georgia in September 2010. Harrison Cert. Ex. B. She entered LHES as a fourth-grader. Harrison Cert. Ex. B.

### K.T.'s Fourth Grade Year – 2010-2011

K.T.'s problems at school began that September, when K.T.'s mother, Katina Thomas, reported that K.T. had received a note stating "I hate you" from a boy in class. Harrison Cert. Ex. C at 11:17-12:1. K.T. indicated that the letter also stated that the boy planned to beat her up after class because she was "country." Harrison Cert. Ex. D at 8:10-13, 10:14-11:3. This same boy later spat in her face. Harrison Cert. Ex. D at 9:8-

1

15. K.T. and her mother met with K.T.'s fourth-grade teacher, Ms. McKinnon, Assistant Principal Ella Tidwell, the boy, and his mother about the incidents.

In the fall of 2010, another student kicked K.T. in the leg. Harrison Cert. Ex. C at 15:10-22. Then, in October 2010, K.T.'s mother told Ms. Tidwell that a student had spit in K.T.'s hair. Harrison Cert. Ex. D at 12:24-13:13. Ms. Tidwell interviewed K.T., who stated that she was spat on while walking up a stairwell with her class. Harrison Cert. Ex. E. Ms. Tidwell also interviewed Ms. McKinnon, who confirmed that someone had spat in the stairwell. Harrison Cert. Ex. E. However, Ms. McKinnon could not identify a culprit. See Harrison Cert. Ex. E. On October 14, 2010, K.T. went to the nurse with her mother to report that someone had hit her. Harrison Cert. Ex. F. However, the nurse saw no sign of an injury, and K.T. eventually conceded that nobody hit her. Harrison Cert. Ex. F.

At some point during the year, K.T. came home from school and told her mother that she was kicked in the leg by a female student. Harrison Cert. Ex. C at 15:15-22; Harrison Cert. Ex. D at 14:3-15:6. K.T. also informed Ms. McKinnon about this incident, who resolved the situation by separating that student from K.T. Harrison Cert. Ex. C at 15:15-22; Harrison Cert. Ex. D at 14:3-15:6. K.T.'s mother, K.T and K.T.'s aunt, Toni Byrd met with Ms. Tidwill about the incident. Harrison Cert. Ex. C at 16:6-10. Ms. Tidwill was unwilling to discipline the other girl because the other girl had denied kicking K.T., and she had been unable to otherwise substantiate K.T.'s allegation. Harrison Cert. Ex. C 16:13-15, 17:16-22.

On February 23, 2011, K.T. was involved in a physical confrontation with two male students. Harrison Cert. Ex. I. The school nurse reported the incident to Ms. Tidwell, who conducted an investigation. Harrison Cert. Ex. I. The parents of all of the involved students attended a conference. Harrison Cert. Ex. I. The boys stated that they were fighting, and K.T. was accidently hit, at which point she joined into the fight. Harrison Cert. Ex. I.

At the end of March 2011, K.T. reported that a male student had punched her. Ms. Tidwell held a conference with Ms. McKinnon, K.T.'s mother, K.T.'s aunt and the parents of the accused student to address and investigate K.T.'s allegation. Harrison Cert. Ex. L. Ms. Tidwell concluded that the male student had told K.T. "let's play fight," and then hit her. Harrison Cert. Ex. L. At the meeting, the students' parents discussed appropriate behavior with their children, and the parties agreed that Ms. McKinnon would provide the parents with weekly progress and behavior reports. Harrison Cert. Ex. C at 27:22-28:1; Harrison Cert. Ex. L. The parties also agreed that the students would not call or text message each other in the future. Harrison Cert. Ex. C at 27:22-28:1; Harrison Cert. Ex. L.

On April 12, 2011, K.T.'s mother wrote a letter to Superintendent Gloria Scott complaining about the bullying and stating that the school was not sufficiently responding to the problem. Certification of Christopher C. Roberts ("Roberts Cert.") Ex.

4. Superintendent Scott did not respond to the letter. Roberts Cert Ex. 1 at 28:12-25, 29:22.

On April 13, 2011, K.T. attempted to stab a male student with a pair of scissors. Harrison Cert. Ex. M. Specifically, K.T. grabbed the scissors from Ms. McKinnon's desk and ran out of the classroom and down the hallway after a male student. Harrison Cert. Ex. M. Ms. McKinnon retrieved K.T. and the scissors and called the front office for assistance. Harrison Cert. Ex. M. When Assistant Principal Tidwell entered the classroom, she saw K.T. being restrained by Ms. McKinnon. Harrison Cert. Ex. O. K.T. broke away, and once again grabbed the scissors and chased after the boy. Harrison Cert. Ex. O. Assistant Principal was able to restrain K.T., and then removed K.T. from the classroom. Harrison Cert. Ex. O. At her deposition, K.T. testified that she ran after the boy because he had hit her. Harrison Cert. Ex. D at 18:7-19:13. The boy denied hitting K.T. Harrison Cert. Ex. D at 18:7-19:13. Ms. McKinnon completed a report regarding the incident, and K.T. was suspended for two days. Harrison Cert. Ex. M; Harrison Cert. Ex. P.

At the end of the 2010-2011 school year, K.T. informed her mother that a female classmate, who K.T. considered to be a friend, had told K.T. that she was gay and was going to make K.T. a lesbian. Harrison Cert. Ex. D at 26:3-8. Her mother reported the incident to Ms. McKinnon. Harrison Cert. Ex. D at 26:3-8. Ms. McKinnon contacted the parents of the accused student and informed Assistant Principal Tidwell of K.T.'s allegation. Harrison Cert. Ex. R. Assistant Principal Tidwell investigated K.T.'s report and met with K.T.'s mother, K.T.'s aunt, and the father of the female student about the incident. Harrison Cert. Ex. R. Ms. Tidwell also interviewed the female classmate, who told Ms. Tidwell that she had simply written K.T. a note asking to be friends. Harrison Cert. Ex. R. Ms. Tidwell was able to review the note and confirmed that it did in fact ask K.T. if she wanted to be friends, with a space next to the question for a "yes" or "no" response. Harrison Cert. Ex. R. K.T. testified that she did not read the note and did not know what the note said. Harrison Cert. Ex. D at 27:20-24. There were no corroborating witnesses to verify either child's version of the conversation, and Ms. Tidwell was unable to substantiate K.T.'s allegations. Harrison Cert. Ex. R. K.T.'s mother and aunt requested that the girls be separated, and Ms. Tidwell directed the students to stay away from each other. Harrison Cert. Ex. R. The school established parent communications logs to keep the parents informed of any further concerns. Harrison Cert. Ex. R.

In her Complaint, Plaintiff also alleged that K.T. was kicked down the stairs during the 2010-2011 school year. However, K.T.'s mother had no recollection of the incident. Harrison Cert. Ex. C at 80:17-22. The Nurse Office Visit Log for K.T. for the 2010-2011 school year contains no reference to injuries resulting from this allegation. Harrison Cert. Ex. F.

New Jersey's Anti-Bullying Bill of Rights Act[1]

In January 2011, Governor Christie signed an amendment strengthening New Jersey's anti-bullying statute, the Anti-Bullying Bill of Rights Act (the "Anti-Bullying Act"). See N.J. Stat. Ann. § 18A:37-13 et seq. The new provisions took effect during the 2011-2012 school year, and included new training and reporting requirements.

As amended, the Anti-Bullying Act requires each school district to adopt a policy prohibiting harassment, intimidation or bullying on school property. N.J. Stat. Ann. § 18A:37-15(a). That policy must provide a procedure for the investigation of harassment, intimidation, and bullying reports. N.J. Stat. Ann. § 18A:37-15(b)(6). Additionally, each school must appoint an anti-bullying specialist to lead the investigation of harassment, intimidation, and bullying reports. N.J. Stat. Ann. § 18A:37-20(a)(3). The Anti-Bullying Act specifically states that it "does not create or alter any tort liability." N.J. Stat. Ann. § 18A:37-37.

K.T.'s Fifth Grade Year – 2011-2012

At her mother's request, K.T. was moved to Ms. Bank's classroom on the first day of the new school year. Harrison Cert. Ex. C at 38:7-20. K.T.'s mother requested the change because many of the student's from K.T.'s fourth grade class were in her originally assigned classroom. Harrison Cert. Ex. C at 38:7-20. In the fall of 2011, K.T. and her family moved into a shelter in Newark, and K.T. began therapy at Family Connections in November 2011. Harrison Cert. Ex. T at 19:8-17, 28:15-17.) The Family Crisis Intervention Program fully funded K.T.'s therapy. Harrison Cert. Ex. Y at 33:2-35:5.

K.T. testified that, at the beginning of the 2011-2012 school year, a student kicked her. Harrison Cert. Ex. D at 14:1-15:9. On November 22, 2011, K.T.'s mother filed a Harassment, Intimidation, Bullying ("HIB") complaint indicating that a male student had teased K.T. about her mother's weight and her aunt's disability, and then spit sunflower seeds in K.T.'s locker. Harrison Cert. Ex. C at 83:11-14; Harrison Cert. Ex. U. The report states that when K.T. tried to move the sunflower seeds to the front of the male student's locker, he stepped on K.T.'s hand and broke her ring. Harrison Cert. Ex. U. The school's Anti-Bullying Specialist, Viola Carty, investigated the incident and found no evidence or witnesses substantiating the allegations. Harrison Cert. Ex. U. Thus, the HIB complaint was unsubstantiated. Harrison Cert. Ex. U. However, Principal Jackson and Assistant Principal Tidwell met with K.T., K.T.'s mother, K.T.'s aunt, the other student, and his mother regarding the alleged incident. Harrison Cert. Ex. U. Shortly thereafter, K.T.'s mother wrote to the school stating that the parents had resolved the issue and requesting that the school take no further action regarding the matter. Harrison Cert. Ex. U.

---

[1] A discussion of New Jersey's Anti-Bullying Bill of Rights Act is helpful for context at this juncture. However, the Court notes that this description of the law is not part of the undisputed facts of this case.

Also in November 2011, K.T.'s mother reported that two female students had punched K.T. in the eye, blackening it. Harrison Cert. Ex. D at 41:2; Harrison Cert. Ex. V. The exact time and date of the incident is unclear, because K.T. never reported it to her teacher and only reported it to her mother several days later. Harrison Cert. Ex. D at 41:2; Harrison Cert. Ex. V. K.T. was not sure why the girls had punched her. Harrison Cert. Ex. D at 23:1-14. Principal Jackson and Assistant Principal Tidwell held a conference with the parents of the accused girls, as well as K.T.'s mother and K.T.'s aunt. Harrison Cert. Ex. C at 43:3-24; Harrison Cert. Ex. V. The girls denied hitting K.T., and there were no witnesses to the alleged incident. Harrison Cert. Ex. C at 43:3-24; Harrison Cert. Ex. V. Therefore, K.T.'s allegation was not substantiated. Harrison Cert. Ex. C at 43:3-24; Harrison Cert. Ex. V.

K.T. began counseling with Family Connections on November 3, 2011. Roberts Cert. Ex. 7. At the outset of her treatment, she was diagnosed with Adjustment Disorder with a Disturbance of Emotions and Conduct, Enuresis, and Trichotillomania. Roberts Cert. Ex. 7.

Later in November, due to an indication that K.T. felt unsafe at school, Principal Jackson and Assistant Principal Tidwell initiated a parent conference to establish an Action Plan to ensure K.T.'s safety. Harrison Cert. Ex. W. During the meeting, the parties formulated a plan to separate K.T. from the girls who made her uncomfortable and to ensure that K.T. was never without adult supervision (the "Escort Plan"). Harrison Cert. Ex. W. Pursuant to the Escort Plan, K.T.'s classroom seat was changed, Ms. Banks became K.T.'s travel partner between classes, a school employee would escort K.T. to lunch, and K.T. was assigned to a different class for recess. Harrison Cert. Ex. D 43:15-45:14; Harrison Cert. Ex. W. K.T. was also encouraged to report any problems that she had with other students to her teacher or the administration. Harrison Cert. Ex. W.

K.T.'s therapists at Family Connections, Jillian DeGroot and Ashley Saha, testified that they spoke with K.T. about the bullying at LHES. Harrison Cert. Ex. T at 35:16-36:13, 39:6-11, 41:5-25; Harrison Cert. Ex. Y at 18:3-13, 32:4-14, 36:23-37:6. Ms. DeGroot testified that K.T. expressed concern about her mother coming to school every day, as K.T. felt that it contributed to her being bullied. K.T. explained that she thought she was being picked on because of her mother's weight. Harrison Cert. Ex. T at 36:14-25.

In January, K.T.'s mother filed an HIB complaint against a student for calling K.T. a "bitch." Harrison Cert. Ex. AA. K.T.'s mother reported that the student had also previously called K.T. a "whore." Harrison Cert. Ex. AA. K.T.'s mother expressed uncertainty over when the incident occurred. Harrison Cert. Ex. AA. Harrison Cert. Ex. AA. Ms. Carty investigated the allegation. Harrison Cert. Ex. AA. K.T. had difficultly remembering the incident. Harrison Cert. Ex. AA. She did not know why the student called her a "bitch," and she herself had not reported the incident to her teacher or any adult at school. Harrison Cert. Ex. D at 15:16-18; Harrison Cert. Ex. AA. Ms. Carty was unable to locate any witnesses, and the boy denied calling K.T. a "bitch" or any other

curse word. Harrison Cert. Ex. AA. Ms. Carty was therefore unable to substantiate the HIB complaint. Harrison Cert. Ex. AA. A few days later, K.T.'s mother filed another HIB complaint, alleging that a student had told K.T. that he was going to teach K.T. "how to keep her mouth closed" in retaliation for K.T. alleging that he had vandalized a teacher's car. Harrison Cert. Ex. BB. K.T. herself never reported the incident to any teacher or administrator and did not recall the incident during her deposition. Harrison Cert. Ex. BB. Ms. Carty was unable to substantiate this incident. Harrison Cert. Ex. BB. However, in an effort to resolve the confrontation between the two students, they each received group counseling once a week through the guidance department. Harrison Cert. Ex. CC.

In February 2011, at her mother's request, K.T. was moved from Ms. Bank's class to Ms. Furka's class. Harrison Cert. Ex. C at 58:1-15. At her deposition, K.T. testified that following the transfer, she was almost "jumped" by five girls. Harrison Cert. Ex. D at 30:2-31:11. She stated that the girls were waiting for her to get out of the bathroom and she heard them saying "we gonna get her." Harrison Cert. Ex. D at 30:2-31:11. K.T. testified that the girls were from her new class, and she had never had any problems with them before this incident. Harrison Cert. Ex. D at 32:2-12. She did not know why they wanted to "jump" her. Harrison Cert. Ex. D at 32:2-12. When the administration met with the accused girls and K.T.'s mother, the girls all denied saying that they were going to "jump" K.T. Harrison Cert. Ex. D at 32:1-8.

On February 1, 2012, K.T.'s mother, as guardian ad litem for K.T., filed suit against Defendants in New Jersey Superior Court. Defendants removed the action to this Court. At a deposition, K.T. testified that the bullying caused her to feel pressure, which she described as her heart pounding. However, K.T. stated that the incidents of bullying did not make her feel sick. Harrison Cert. Ex. D at 57:10-19. K.T.'s mother stated that K.T. did not suffer any physical injuries beyond a black eye, a bruise on her arm, and a bruise on her leg as a result of being bullied. Harrison Cert. Ex. C at 94:11-15.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* The opposing party must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, to withstand a proper motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57.

## III. DISCUSSION

Plaintiff asserts four Counts against Defendants, claiming violations of the New Jersey Law Against Discrimination (the "NJLAD") (Count One) and the United States and New Jersey State Constitutions (Counts Two and Three), as well as negligent infliction of emotional distress (Count Four). The Court will grant summary judgment to Defendants on each of Plaintiff's claims.

### A. Hostile School Environment under the NJLAD

In Count One, Plaintiff alleges that Defendants subjected K.T. to a hostile school environment during the 2010-2011 and 2011-2012 school years due to her gender and because she previously lived in Georgia. Defendants argue that they are entitled to summary judgment because discovery has revealed no evidence that K.T. was bullied because she is female and the NJLAD does not confer protected status on someone for being from the southern United States. The Court agrees, and will grant Defendants summary judgment on Count One.

The LAD provides that:

> All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

N.J. Stat. Ann. 10:5-4. The LAD's protections apply to public school students. N.J.S.A. 10:5–5; *see also L.W. ex rel. L.G. v. Toms River Regional Sch. Bd. of Educ.*, 915 A.2d 535, 549 (N.J. 2007) (finding that the NJLAD "applies universally to 'places of public accommodation,' a defined term that includes schools regardless of their source of funding"). However, a school cannot be expected to shelter students from all instances of peer harassment. *L.W.*, 915 A.2d at 550. "[I]solated schoolyard insults or classroom taunts are not actionable." *Id.* at 547. Rather, to state a hostile school environment claim

under the NJLAD, an aggrieved student must allege (1) "discriminatory conduct that would not have occurred 'but for' the student's protected characteristic," (2) "that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment, and" (3) "that the school district failed to reasonably address such conduct." *Id.*

### 1. Gender discrimination

The LAD applies to gender discrimination in a school setting. *See L.W.*, 915 A.2d at 550; *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993). However, even considering the facts in the light most favorable to Plaintiff, a reasonable jury could not conclude K.T. was bullied because of her gender. The deposition transcripts, HIB reports and parent teacher conference notes reflect that K.T. was bullied by both male and female students. Nothing in the record indicates or suggests that she was bullied because she is a girl. Moreover, neither K.T., nor her mother, suggested that the harassment was related to K.T.'s gender. In fact, the deposition testimony from K.T.'s therapists indicates that K.T. believed that she was being picked on because of her mother's weight.

Plaintiff argues that one student called K.T. a "bitch" and a "whore," and that another told K.T. that she was going to make her a "lesbian." However, these incidents alone are insufficient to establish that the bullying was gender-based. Furthermore, to the extent that these isolated incidents may be related to K.T.'s gender, no reasonable juror could conclude that they amount to the "severe and pervasive" discrimination necessary to maintain a claim under the NJLAD. *See Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 577 (D.N.J. 2005) (stating that "a few isolated incidents do not suffice" under Title VII and the NJLAD); *see also King v. City of Phila.*, 66 Fed.Appx. 300, 305 (3d Cir.2003) (finding that two "isolated and sporadic incidents ... do not demonstrate the pervasive atmosphere of harassment required to prove a Title VII violation."). Plaintiff's claim of gender-based discrimination under the NJLAD therefore fails.

### 2. Discrimination based on Southern-American heritage

Plaintiff's claim that she was discriminated against because she is from the southern United States is also unavailing. To bring a claim under the LAD, a plaintiff must allege discrimination based on a *protected* characteristic. *Id.* at 547. No prior court has considered whether Southern-American heritage is a protected characteristic under the NJLAD. However, to prove a claim under the NJLAD, a plaintiff generally must make the same factual showing as under Title IV of the Civil Rights Act of 1964. *See Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) (holding that the analysis of a claim made pursuant to the NJLAD is generally the same as that of a Title VII claim); *Lehmann v. Toys R Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993) (noting that the federal precedent governing Title VII is a key source of interpretive authority when construing the LAD). Being born or raised in the southern United States is not a protected trait under Title VII. *See Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973) (finding that "national origin" refers to the "country where a person was born, or,

more broadly, the country from which his or her ancestors came"); *see also Williams v. Frank*, 757 F. Supp. 112, 120 (D. Mass. 1991) (". . . Southernness is not a protected trait."). Accordingly, the Court finds that the NJLAD does not provide K.T. with protected status for being from the southern United States, and Defendants are entitled to summary judgment on this claim.

Finally, Plaintiff's Opposition Brief appears to assert a claim against Dr. Scott for "aiding and abetting" under the LAD. Pl.'s Opposition 52, ECF No. 24-1. Plaintiff did not plead this cause of action in her Complaint. Accordingly, it cannot provide a basis for liability in this case, and the Court need not address it further. *See Bell v. City of Philadelphia*, 275 Fed. App'x 157, 160 (3d Cir. 2008) (stating that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Thus, because the undisputed facts do not show that Plaintiff was bullied because of a protected characteristic under the NJLAD, Defendants are entitled to summary judgment on Count One.[2]

### B. Federal and State Constitutional Claims

Counts Two and Three assert a number of federal and state civil rights claims against the Board and Superintendent Scott. Specifically, Plaintiff alleges that Defendants: (1) violated 42 U.S.C. Sections 1981, 1983 and 1988 and the First, Fourth, Fifth, and Fourteenth Amendment of the United States Constitution, and (2) Article I of the New Jersey Constitution.[3]

#### i. Violations of 42 U.S.C. Sections 1981, 1983, and 1988 and the United States Constitution

Plaintiff alleges that Defendants violated her rights under 42 U.S.C. Sections 1981, 1983 and 1988. Plaintiff has not stated allegations or produced evidence supporting a claim under Section 1981, which proscribes discrimination in making or enforcing contracts against, or in favor of, any race. *Gratz v. Bollinger*, 539 U.S. 244, 276 n. 23 (2003). And Section 1988 does not create an independent cause of action. Rather, it "defines procedures under which remedies may be sought in civil rights actions." *Schroder v. Volcker*, 864 F.2d 97, 99 (10th Cir. 1988). The Court will therefore dismiss Plaintiff's Section 1981 and Section 1988 claims.

Regarding Section 1983, to establish a claim, a plaintiff must allege that a person acting under the color of state law deprived her of a federally protected right. *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). Here, Plaintiff grounds her Section 1983 claim

---

[2] In light of the Court's determination that Plaintiff has failed to establish a claim for discrimination under the NJLAD, Plaintiff's claim for compensatory and punitive damages under the NJLAD is dismissed as moot.

[3] In Count Two, Plaintiff alleges that Defendants denied her equal protection, violated her right to due process under the United States Constitution and Article I of the New Jersey Constitution, and engaged in discriminatory enforcement of the Anti-Bullying Act. In Count Three, Plaintiff then states a litany of claims, including violations of 42 U.S.C. Sections 1981, 1983, and 1988 and the First, Fourth, Fifth and Fourteenth Amendment, with scant explanation as to the basis for any of its claims. As a preliminary matter, the United States Constitution itself does not provide a cause of action. *National Amusements, Inc. v. Palmyra*, 843 F. Supp. 2d 538, 544 (D.N.J. 2012). Therefore, the Court will analyze the federal claims in Count Two as arising under 42 U.S.C. Section 1983.

in the First, Fourth, Fifth, and Fourteenth Amendments. Defendants argues that qualified immunity shields Superintendent Scott from these claims, and that Plaintiff has failed to provide evidence showing that Defendants' conduct violated any constitutional right. The Court agrees, and will grant Defendants summary judgment on Plaintiff's Section 1983 claim.

### 1. Superintendent Scott and Qualified Immunity

Qualified immunity shields officials from liability for civil damages provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is the plaintiff's burden to present evidence that a defendant is not entitled to qualified immunity when the defense is raised. *See Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001). To overcome a defense of qualified immunity, a plaintiff must show that: "(1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011)). The court may examine these factors in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Plaintiff sole allegation against Superintendent Scott is that K.T.'s mother wrote a letter to her and the EOBE about the bullying, but that she failed to respond or curb the abuse. Harrison Cert. Ex. A ¶ 13. As explained below, Plaintiff has not demonstrated that this conduct violated any statutory or constitutional right, let alone a "clearly established" statutory or constitutional right. Accordingly, Superintendent Scott has qualified immunity and is entitled to summary judgment on Plaintiff's Section 1983 claim. *See Joyce v. City of Sea Isle City*, CIV. 04-5345RBK, 2008 WL 906266 (D.N.J. Mar. 31, 2008) ("The first step of the qualified immunity analysis involves an evaluation of whether Plaintiffs set forth constitutional violations; as a result, the Court simultaneously determines whether summary judgment is appropriate.").

### 2. First Amendment

Plaintiff cannot base her Section 1983 claim on the First Amendment. To establish a First Amendment violation, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant took an adverse action against her, and (3) the protected activity was a "substantial or motivating factor" in the adverse action. *Swineford v. Snyder County*, 15 F.3d 1258, 1270 (3d Cir. 1994). If a plaintiff is able to set forth a prima facia claim, then the burden shifts to the defendant to show that it "would have taken the same action even in absence of the protected activity." *Id.* at 1270. Here, nothing in the record shows that Plaintiff has engaged in any plausibly protected activity under the First Amendment of the United States Constitution. Plaintiff's First Amendment claim therefore fails.

### 3. Fourth Amendment

Plaintiff also has not established a Fourth Amendment violation. The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. Plaintiff did not allege within the Complaint, and Plaintiff has not shown through discovery, that K.T. was the victim of an unconstitutional search or seizure. Thus, this claim fails.

### 4. Fifth Amendment

Plaintiff does not specify, in the Complaint or otherwise, how exactly Defendants violated the Fifth Amendment. Regardless, the Fifth Amendment restricts the actions of federal officials, not state actors such as the EOBE and Superintendent Smith. *Nguyen v. U.S. Cath. Conf.*, 719 F.2d 52, 54 (3d Cir. 1983); *D & D Associates, Inc. v. Bd. of Educ. of N. Plainfield*, CIV.A. 03-1026MLC, 2007 WL 4554208 (D.N.J. Dec. 21, 2007) *aff'd*, 12-2046, 2014 WL 56401 (3d Cir. Jan. 8, 2014). Accordingly, Plaintiff cannot ground her Section 1983 claim in the Fifth Amendment.

### 5. Fourteenth Amendment

Finally, Plaintiff has not produced evidence showing that Defendants violated her rights to either equal protection or substantive due process under the Fourteenth Amendment.

#### a. Equal protection

Plaintiff claims that Defendants violated the equal protection clause of the Fourteenth Amendment because they deprived her of her right to an education by failing to stop the harassment and implementing the Escort Plan as a solution to the bullying. Plaintiff also claims that Defendants engaged in discriminatory enforcement of the Anti-Bullying Act. Specifically, Plaintiff argues that treated K.T. differently than the students that harassed her, because she was suspended for chasing another student with scissors.

The equal protection clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." The equal protection clause prevents states from making distinctions that: (1) target a suspect class; (2) burden fundamental rights; or (3) intentionally treat one individual differently from others similarly situated without any rational basis. *Young v. New Sewickley Twp.*, 160 Fed. App'x 263, 266 (3d Cir. 2005) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)).

When a plaintiff claims that her rights under the equal protection clause have been violated on the basis of being treated differently from others similarly situated, she is asserting a claim under a "class of one" theory. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008). To assert a "class of one" claim, the plaintiff must produce facts showing that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564.

Plaintiff first argues that Defendants have deprived K.T. of a fundamental right – her right to a public education. There is, however, no fundamental right to a public education under the United States Constitution. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35-36 (1973). Moreover, Plaintiff has not produced evidence showing that K.T. was denied a public education. *See Martin v. Shawano–Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir. 2002) (citing *San Antonio Indep. Sch. Dist.*, 411 U.S. at 33–34 (1973) (finding that a child was not denied a public education where he was not suspended or expelled and was permitted to attend school at all times relevant to the case). With the exception of the two-day suspension that K.T. received for chasing another student with scissors, K.T. was permitted to attend school at all times relevant to this case. Furthermore, nothing in the record indicates that K.T. missed school or was denied any other educational benefit as a result of the Escort Plan or the bullying.

Plaintiff also asserts an equal protection claim as a class of one, arguing that Defendants engaged in discriminatory enforcement of the Anti-Bullying Act. Specifically, Plaintiff argues that Defendants discriminated against her in their treatment of her reports of bullying and by suspending her for trying to stab another student with scissors. However, regarding K.T.'s reports of bullying, nothing in the record indicates that K.T. was treated differently than other similarly situated students. First of all, Plaintiff has not produced any evidence showing that Defendants treated K.T.'s bullying reports differently than those from any other student from the southern United States or any other student who has filed a bullying complaint. To the extent that Plaintiff argues that K.T. was treated differently than other students who committee acts of bullying, because she was suspended for attempting to stab another student with scissors, the undisputed facts provide a rational basis for any disparate treatment. Plaintiff does not dispute that K.T. grabbed scissors out of her teacher's desk and ran after another student, stopping only when physically restrained by an adult. A teacher, Ms. McKinnon, witnessed the incident. Conversely, K.T.'s allegations of bullying, although investigated, were largely unsubstantiated and did not involve scissors. Accordingly, this argument also fails, and Plaintiff cannot base her Section 1983 claim on the equal protection clause of the Fourteenth Amendment.

### b. Substantive due process

Finally, Plaintiff attempts to ground her Section 1983 claim in the due process clause of the Fourteenth Amendment. The due process clause provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiff invokes the substantive component of due process, which "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Specifically, Plaintiff alleges that Defendants violated K.T.'s due process rights by failing to protect her from the bullying.

The due process clause generally does not impose an affirmative obligation on states to protect individuals from private citizens. *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989). However, this general rule is subject to two caveats. *See Morrow v. Balaski*, 719 F.3d 160, 166-67 (3d Cir. 2013). The first is the "special relationship" exception, which applies where "the [s]tate takes a person into its custody and holds him there against his will." *Id.* at 199–200. The second is the "state-created danger" exception, which imposes "an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow*, 719 F.3d at 167 (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996)).

The special relationship exception generally does not apply to public schools faced with due process claims by their students. *Id.* at 170-71 (stating that "public schools, as a general matter, do not have a constitutional duty to protect students from private actors"). However, the Third Circuit has recognized "the possibility of a special relationship arising between a particular school and particular students under certain unique and narrow circumstances." *Id.* at 171. For this exception to apply, the circumstances must "forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administrators as part of the school's traditional in loco parentis authority or compulsory attendance laws." *Id.* at 171. The circumstances must show that the school has limited the student's freedom to act on her own behalf in a manner analogous to the state's authority over an incarcerated prisoner or an individual who has been involuntarily committed. *Id.* at 169-70. Accordingly, a school's knowledge of a threat to a student or its expressions of intent to help a student is not enough. *Id.* at 172-73 (refusing to recognize a special relationship in a case involving "a violent bully subject to two restraining orders").

Regarding the state created danger theory, liability may attach where the state's affirmative act creates or enhances a danger that causes injury. *Id.* at 177. To prevail on this theory, the plaintiff must prove that: "1) the harm ultimately caused was foreseeable and fairly direct; 2) a state actor acted with a degree of culpability that shocks the conscience; 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Id.*

Plaintiff has failed to produce evidence showing that either exception applies to this case. Nothing in the record indicates that Defendants placed restraints on K.T.'s freedom to act on her own behalf that were similar to those placed on incarcerated or involuntarily committed individuals. Thus, the special relationship exception does not apply. With respect to the state-created danger exception, the record contains no evidence of any affirmative action by Defendants that made K.T. more vulnerable to the bullying. Accordingly, Plaintiff cannot base her Section 1983 claim on the due process clause of the Fourteenth Amendment.

Plaintiff has failed to produce evidence from which a reasonable juror could conclude that Defendants violated the First, Fourth, Fifth, or Fourteenth Amendments of the United States Constitution. Defendants are therefore entitled to summary judgment on her Section 1983 claim.

### ii. New Jersey Constitution

Plaintiff also claims that Defendants violated K.T.'s rights to due process and equal protection under the New Jersey Constitution. Although the New Jersey Constitution does not contain the phrases "equal protection" or "due process," courts have interpreted Article 1 of the New Jersey Constitution as providing both due process and equal protection guarantees. *See K.J. ex rel. Lowry v. Div. of Youth and Family Svcs.*, 363 F. Supp. 2d 728, 745 (D.N.J. 2005); *Peper v. Princeton University Bd. Of Trustees*, 77 N.J. 55, 79 (1978). However, the New Jersey Constitution does not provide a private right of action for violations of an individual's due process or, except for in the employment context, equal protection rights. *Lowry*, 363 F. Supp. 2d at 745-47 ("Those cases permitting a private right of action for a violation of an individual's rights under the New Jersey Constitution appear to be limited to employment discrimination under equal protection"). Accordingly, Defendants are entitled to summary judgment on Plaintiff's state constitutional claims.

Plaintiff has thus failed to produce evidence from which a reasonable juror could conclude that Defendants violated any state or federal constitutional right, and the Court will grant Defendants summary judgment on Counts Two and Three.[4]

## C. Negligent Infliction of Emotional Distress

Finally, Plaintiff alleges that Defendants breached their duties under the Anti-Bullying Bill of Rights and failed to "exercise due care" regarding K.T.'s harassment, causing K.T. emotional distress. In the Complaint, Plaintiff characterizes Count Four as a claim for negligent infliction of emotional distress. In its Opposition, Plaintiff then re-characterizes Count Four as a claim for intentional infliction of emotional distress under the NJLAD. Plaintiff did not plead intentional infliction of emotional distress in her Complaint. Therefore, it is not a basis for liability in this case, and the Court need not address it further. *See Bell v. City of Philadelphia*, 275 Fed. App'x 157, 160 (3d Cir.2008) (stating that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). As to the claim for negligent infliction of emotional distress, the Court will grant Defendants' summary judgment motion.

As noted above, the Anti-Bullying Act "does not create or alter any tort liability." N.J. Stat. Ann. § 18A:37-37. Therefore, it cannot provide a basis for Plaintiff's negligent infliction of emotional distress claim. Furthermore, the New Jersey Tort Claims Act (the "NJTCA") limits Defendants' liability for this claim.

---

[4] In light of the Court's determination that Plaintiff has failed to establish a violation of her constitutional rights, Plaintiff's claims for compensatory and punitive damages under Counts Two and Three are dismissed as moot.

The NJTCA provides, in relevant part:

No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

New Jersey Stat. Ann. § 59:9–2(d). Thus, in the absence of physical injury, a plaintiff cannot recover compensatory damages from public entities or public employees for mental or emotional distress. *See Carlino v. Gloucester City High Sch.*, 57 F. Supp. 2d 1, 28-29 (D.N.J. 1999) *aff'd in part*, 44 F. App'x 599 (3d Cir. 2002); *Ayers v. Township of Jackson*, 525 A.2d 287, 287 (N.J. 1987) (holding that "the [New Jersey] legislature has expressly determined that the pain and suffering occasioned by ... emotional distress is not compensable by damages" from a municipality). Furthermore, under the NJTCA "[n]o punitive or exemplary damages shall be awarded against a public entity." N.J.S.A. 59:9–2(c).

Plaintiff alleges her negligent infliction of emotional distress claim against EOBE, a public entity, and Ms. Scott, a public employee. Because she has not produced evidence of any physical injury resulting in medical treatment expenses in excess of $3,600.00, the NJTCA provides Defendants with immunity from liability for compensatory damages based on this claim. New Jersey Stat. Ann. § 59:9–2(d). The NJTCA also bars her from recovering punitive damages from EOBE. The NJTCA does not provide immunity from punitive damages to a public employee such as Superintendent Scott. *See Mantz v. Chain*, 239 F. Supp. 2d 486, 508 (D.N.J. 2002) ("While the TCA expressly bars recovery of punitive damages against public entities . . . , the New Jersey courts have held that 'no such immunity exists [under the TCA] for public employees.'"). However, that remaining claim also fails.

To recover for negligent infliction of emotional distress, a plaintiff must demonstrate that the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in substantial bodily injury or sickness.[5] *Jablonowska v. Suther*, 948 A.2d 610, 617 (N.J. 2008) (citing *Falzone v. Busch*, 214 A.2d 12, 12 (N.J. 1965). The New Jersey Supreme Court has emphasized that "where fright does not cause substantial bodily injury or sickness, it is to be regarded as too lacking in seriousness and too speculative to warrant the imposition of liability." *Id.* (quoting *Falzone*, 214 A.2d at 12).

Plaintiff has not produced evidence from which a reasonable juror could conclude that K.T. suffered substantial bodily injury or sickness as a result of her alleged emotional

---

[5] A plaintiff can also set forth a bystander claim for negligent infliction of emotional distress by showing: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Portee v. Jaffee*, 417 A.2d 521, 521 (N.J. 1980). However, Plaintiff has not alleged a bystander claim in this case.

15

distress.  In K.T's deposition testimony, she stated that the bullying did not make her feel sick.  Harrison Cert. Ex. D at 57:10-19.  Moreover, although Plaintiff has produced evidence showing that she has Adjustment Disorder with a Disturbance of Emotions and Conduct, Enuresis, and Trichotillomania, nothing in the record indicates that this disorder is related to the bullying incidents at school.  Roberts Cert. Ex. 7.  Accordingly, Plaintiff has not produced sufficient evidence to maintain a claim for negligent infliction of emotional distress, and Defendants are entitled to summary judgment on Count Four.

## IV.     CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE**.  An appropriate order follows.


    /s/ William J. Martini  
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: February 6, 2014**